**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **JOAN D. MARTIN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:10-CV-236 (MTT)** |
| ) | |
| **PEACH COUNTY, GEORGIA, and** ) | |
| **TERRY DEESE, individually and in his** ) | |
| **official capacity as Sheriff,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>ORDER</u>

This matter is before the Court on the Defendants' Motion for Summary

Judgment.  (Doc. 31).  For the reasons set forth below, the Motion is granted.

## I.  PROCEDURAL BACKGROUND

Plaintiff Joan Martin initially filed her pro se Complaint June 15, 2010.  (Doc. 1).

After retaining counsel, she filed an Amended Complaint December 1, 2010, alleging

that Peach County and Sheriff Terry Deese discriminated against her based on her

race, gender, and/or pregnancy, retaliated against her for her complaints of

discrimination, and intentionally inflicted emotional distress upon her.  (Doc. 19).

According to Martin, the Defendants' conduct violated Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.* (Title VII), 42 U.S.C. § 1981, and Georgia state law.

The Defendants seek summary judgment on all claims.

## II.  FACTUAL BACKGROUND

Plaintiff Joan Martin is a thirty-eight-year-old African-American female.  She was first hired at the Peach County, Georgia Sheriff's Office ("PCSO") in July 1998.  Martin was employed as a Detention Officer at the Peach County Jail.  On June 18, 1999, during her first stint of employment at the jail, Martin received a written reprimand (Doc. 31-3 at 31) from her supervisor, Captain Pearl White, for failing to search an inmate in the booking process, resulting in the introduction of contraband into the jail.  (White Aff. ¶ 4).  Captain White, who is also an African-American female, has been the Detention Division Commander in charge of the Peach County Jail since December 1, 1992. (White Aff. ¶ 2).  Although the written reprimand appears in her personnel file and was produced by the Defendants, Martin does not recall this incident, nor does she remember signing or being shown a copy of the reprimand.  (Martin Dep. at 22-23; Martin SOMF ¶ 9).  Martin resigned from her position at the jail on September 1, 2000. (Defendants' SOMF ¶ 10).

At the recommendation of Captain White, Sheriff Terry Deese rehired Martin as a Detention Officer on November 15, 2004.  (Defendants' SOMF ¶ 10).  Martin's duties as a Detention Officer included processing inmates into the computer, transporting inmates to various facilities, monitoring inmates, doing routine cell checks and fingerprinting, and various clerical tasks such as filing and typing.  (Martin Dep. at 18). On March 20, 2007, Martin was again reprimanded for not properly entering charges into the booking computer and for failing to fingerprint three inmates and then lying about it.  (White Aff. ¶ 4).  Although this reprimand is also in Martin's personnel file, unlike the other documents in her file, this reprimand is handwritten, does not appear on

official PCSO forms, and is not signed or dated.  (Doc. 31-3 at 30).  Like the previous reprimand, however, Martin claims she was never shown a copy, that she has "no idea where [it] came from," and that "it's a lie."  (Martin Aff. ¶ 26; Martin Dep. at 23).[1]

On September 18, 2007, Captain White reprimanded Martin for failing to come to the assistance of state patrol officers who were subduing an inmate in the booking area. (White Aff. ¶ 4).  Martin does not deny this occurrence, though she does disagree that her assistance was necessary.  (Martin Aff. ¶ 27).  Martin claims this incident "had never gone further" and "was simply not an issue until [she] became pregnant."  (Martin Aff. ¶ 27).  However, Martin was suspended for one day in connection with the reprimand. (White Aff. ¶ 4).

In November 2007, Martin had oral surgery and missed several days of work. Around the same time, Martin was also getting fitted for dentures.  In total, she was out of work for the dental treatment from November 19, 2007 until December 12, 2007. Martin produced letters from her oral surgeon and dentist confirming her appointments and excusing her absence from work for the days of November 19 (for the surgery, specifying a recovery period of three to five days), November 26, November 28, December 3, December 6, and December 12.  (Doc. 31-3 at 23-28).  Detention Officers work a shift schedule of three days on and two days off, and therefore have weekdays free during which they can attend to personal matters.  (White Aff. ¶ 5).  According to Captain White, however, Martin "did not have sufficient excuses as required by the Sheriff's Office sick and annual leave policy to cover" her absences.  (White Aff. ¶ 5).

---

[1] Martin claims the reprimands in her personnel file were fabricated and only brought up as part of a "fishing expedition" in order to justify her termination.  (Martin Aff. ¶ 28).

In February 2008, Martin learned that she was pregnant.  Martin first told Captain White and Sergeant Elizabeth Davis of her pregnancy on February 28, 2008.  According to Martin, Sergeant Davis was happy for her, but Captain White was less enthusiastic, telling Martin they "had never had a pregnant female in the jail before," and warning Martin of the consequences of exceeding the number of allowed absences under the jail's sick and annual leave policy.  Martin says she perceived Captain White's comments as threatening.  (*See* Martin Aff. ¶ 14).  On March 10, 2008, Captain White repeated to Sergeant Davis, who was also one of Martin's supervisors, that they "had never had a pregnant female before and did not know what to do with [Martin], and that [she] was going to have to do her job."[2]  (Martin Aff. ¶ 13).  Although Martin claims that Captain White was "insincere" with regard to her pregnancy, Martin confirmed that on March 14, 2008, Captain White told her "that she was concerned for [her] because [she] was having a difficult pregnancy," "that she was praying for [Martin]," "to let [Captain White] know if there was anything she could do for [Martin]," and "that she was going to find [Martin] a placement in the jail."  (Martin Dep. at 106-07).

On March 20, 2008, Martin was involved in another incident at the jail.  That day, an inmate was brought into the booking area at the jail while Martin and Sergeant Davis were the booking officers on duty.  While Sergeant Davis was on the phone, Martin excused herself to go to the bathroom.  During her absence, the inmate retrieved his previously-confiscated cell phone from the booking counter and placed it in his pocket.

---

[2] Martin's basis of knowledge regarding this comment is unclear.  She does not claim to have overheard the conversation between Captain White and Sergeant Davis, nor does she offer any sworn testimony from Sergeant Davis.

Later that day, Officer Borders came on duty, and he too failed to search the inmate.[3] Through the apparent fault of all three officers, the inmate smuggled his cell phone into the prison population.

After reviewing a video of the incident, Captain White decided that the appropriate discipline was a verbal reprimand for Officer Borders and a two-day suspension for Martin. According to Captain White, "the two offenses were very different in magnitude. Officer Borders should have searched the inmate, but he reasonably assumed that the inmate had been searched by the day shift. Officer Martin, by contrast, negligently allowed the inmate access to his cell phone, and did not search him before leaving for the day. She had a prior similar reprimand, which, although it was several years earlier, showed a neglect of duty." (White Aff. ¶ 8). Moreover, although Martin claims that she "was suspended for two days for the incident, while neither Sergeant Davis nor Officer Borders were," Sergeant Davis also received a two-day suspension.[4] (2nd Deese Aff. ¶ 2). Martin served her suspension from March 30, 2008 until April 2, 2008. (Martin Dep. at 34).

When Martin returned to work on April 3, 2008, she brought with her a pregnancy-related medical restriction from her physician requesting that she be placed

---

[3] PCSO has an informal policy of requiring male officers to search male inmates and female officers to search female inmates. Martin explained that female officers often "take the items" of incoming male inmates, and vice versa, but that this differs from a full "search," which, when dealing with a male inmate, would be done by a male officer. In this specific instance, Martin admitted that she did not take the inmate's items. (Martin Dep. at 37).

[4] There is some uncertainty regarding what type of punishment Sergeant Davis received and when that punishment was handed down. The Court scheduled a hearing on the Defendants' Motion for Summary Judgment, in part, to discuss several matters that needed clarification. However, Plaintiff's counsel requested that the hearing be cancelled and informed the Court that the Motion could be resolved on the parties' briefs.

in a position in which she would have no contact with inmates.  (Martin Aff. ¶ 18).  Later

that day, Martin was sent home by Captain White, who told Martin, "We've got to find

out what to do with you."  Martin alleges that Captain White made other sarcastic

remarks to her as she was leaving.  (Martin Aff. ¶ 18).  According to Sheriff Deese, "she

was sent home for the rest of the day, not as punishment but to determine a suitable

position.  She was paid for the entire shift."  (2nd Deese Aff. ¶ 3).  When Martin returned

to work, she was assigned to the control tower, which was the usual accommodation for

employees who were on restricted duty due to a medical condition.  (Martin Dep. at 48-

49).  By all accounts, Martin's assignment to the control tower posed no problems for

the Sheriff's Department.  (White Aff. ¶ 6; Deese Aff. ¶ 12; Martin Dep. at 48-49).

On April 4, 2008, Martin attended an appeal hearing regarding her two-day

suspension for the March 20, 2008 incident.[5]  At the hearing, Martin allegedly voiced

her concerns about what she perceived as discriminatory treatment as compared to

Officer Borders.  (Martin Aff. ¶ 19).  That same day, the Appeal Board issued a

recommendation in favor of Martin:

> During the hearing it was determined that the situation that allowed a cell
> phone into the inmate population on March 20, 2008 was based on a
> number of errors by various officers.  Officer Martin admitted her fault in
> the situation, but disputed the allegation that she was solely or totally
> responsible for this violation.  She felt that she should bear no more
> responsibility that [sic] the other detention officers that failed to properly
> follow procedure in this situation, and were given a reprimand for their
> violations.  We agree with this claim and feel that the supervisor on shift,
> who was present at the incident should be held responsible, as such have
> made the following recommendation.  The decision of the Appeal Board is

---

[5] Under PCSO policy, after receiving notice that an employee is pending demotion, suspension, or
termination, he or she may request an appeal hearing in order to present a defense to such actions.
(Doc. 31-3 at 21).

to make an alternate recommendation as to the action as taken against Officer Martin.  It is our recommendation that this suspension be changed to a written reprimand.

(Doc. 31-3 at 32).

According to Martin, the Board explained to her that it would present its findings to the Sheriff, that he would review it, and that Martin would then be given a letter with the decision in writing.  (Martin Dep. at 39; Martin Aff. ¶ 20).  Although there is no evidence in the record to suggest that the Appeal Board's decision was anything more than a recommendation to Sheriff Deese, Martin claims she was told by the Board that their decision was "final" once she received a letter.  (Martin Dep. at 39).

Because the appeal had gone in her favor, when Martin returned to work, she sought a meeting with the Sheriff to determine whether her lost pay from the two-day suspension would be reinstated.  According to Sheriff Deese, after he received the Appeal Board's recommendation, he reviewed Martin's personnel file, paying particular attention to Martin's prior disciplinary infractions and her prolonged absence in November and December 2007.  (Deese Aff. ¶ 6).  Some time prior to the meeting, Martin was told that there was a discrepancy between the time she missed for dental work in November and December 2007 and the excuses she had provided, and that the Sheriff wanted to see all the medical excuses she had.  (Martin Dep. at 51-52).

Martin finally met with Sheriff Deese on April 11, 2008.  The parties have divergent accounts of that meeting.  According to Martin, when she and Captain White entered the meeting, Sheriff Deese immediately "attacked" her, badgering her about the medical slips from her previous absences and confronting her about her past disciplinary infractions.  (Martin Aff. ¶¶ 24-27).   Martin claims the meeting consisted of

"the Sheriff angrily cutting [her] off, not listening to what [she] had to say, and going on a fishing expedition in [her] personnel file, when all [she] was trying to do was set the meeting to see about getting [her] pay reinstated in light of the favorable Appeal hearing."  (Martin Aff. ¶ 28).  Martin claims Sheriff Deese then told her that he was not going to accept the Appeal Board's recommendation, to which Martin responded, "Why did Officer Borders only receive a verbal reprimand, was it because he is a white male or because I am a pregnant black female?"  (Martin Aff. ¶ 29).  At this point, Sheriff Deese allegedly accused Martin of taking things personally, and then yelled "I'm the Sheriff.  I have the final say.  The Sheriff's Department was here before you and the Sheriff's Department is going to be here after you."  (Martin Aff. ¶ 29).  According to Martin, she then became emotional, and in order to avoid a "break down" in front of Sheriff Deese and Captain White, Martin told Sheriff Deese and Captain White, "Y'all are going to have to excuse me."  (Martin Aff. ¶ 31).  Martin then got up and walked out of the meeting, and after finding the bathroom occupied, returned to her post in the control tower.  (Martin Aff. ¶ 31).

According to Sheriff Deese and Captain White, when Martin and Captain White entered the meeting, Sheriff Deese asked Martin to provide the documentation to cover her extended absence in November and December 2007, but Martin refused to discuss the matter.  Instead, Martin would only discuss whether she was going to be reimbursed for her two-day suspension, and, at one point, asked what absenteeism had to do with her two days' pay.  (Deese Aff. ¶ 7; White Aff. ¶ 9).  According to Sheriff Deese, "[i]f Martin was crying in the meeting … it was not visible to [him].  [His] impression of her was not so much that she was upset, but that she was stubborn, irrational, and hostile."

(2nd Deese Aff. ¶ 5).  After contending that the write-ups in her file were "all lies," White claims Martin got up while the Sheriff was speaking and walked out of the room, saying only that she needed to be excused.  (White Aff. ¶ 9).  Assuming that Martin had only stepped out for a moment, Sheriff Deese and Captain White waited a few minutes for Martin to return, which she never did.  (White Aff. ¶ 9).

Approximately thirty minutes after Martin walked out of the meeting, Captain White went to the control tower and told Martin that the Sheriff wanted her and Captain White to return to his office.  When the two returned to Sheriff Deese's office, he asked Martin whether her walking out meant that the meeting was over and whether she walked out because she had no respect for either him or Captain White, to which Martin told Sheriff Deese that she had nothing else to say.  (Deese Aff. ¶ 7; Martin Dep. at 61). According to Sheriff Deese, Martin was unapologetic and did not try to explain her behavior.  (Deese Aff. ¶ 7).  Sheriff Deese then told Martin to go home and that he would think about what action to take regarding her insubordination.  (Deese Aff. ¶ 7). Notably, and Martin does not contend otherwise, Sheriff Deese did not reference Martin's race, gender, or pregnancy at the April 11, 2008, meeting.[6]

When Martin returned to work on April 16, 2008, she met with Sheriff Deese and Peach County Human Resources Director Julie Daniel.  At that meeting, Sheriff Deese terminated Martin due to her insubordination and informed her that the two-day suspension imposed by Captain White would be upheld.  (Martin Aff. ¶ 35).  On April 17,

---

[6] During her deposition, when asked, "Do you think [Sheriff Deese] was mad at you because you were pregnant or mad at you because you walked out?," Martin responded, "I don't know what it was.  All I know, he was upset."  (Martin Dep. at 62-63).

2008, Martin timely filed a Charge of Discrimination with the Equal Employment
Opportunity Commission, a prerequisite to filing a discrimination lawsuit.  After receiving
a Notice of Right to Sue from the EEOC on March 23, 2010, Martin filed this action June
15, 2010.

## III. DISCUSSION

Summary judgment must be granted if the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is no genuine issue as to
any material facts and that the movant is entitled to judgment as a matter of law.  Fed.
R. Civ. P. 56(c).  "A factual dispute is genuine only if 'a reasonable jury could return a
verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281
F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*,
941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove
that no genuine issue of material fact exists.  *Info Sys. & Networks Corp.*, 281 F.3d at
1224.  The district court must "view all evidence in the light most favorable to the
nonmoving party, and resolve all reasonable doubts about the facts in its favor."  *Id.*

### A. Proper Defendants

Before addressing the substance of Martin's discrimination claims, the Court
must determine who the proper Defendants are for each claim.  Section 1981 does not
provide a cause of action against state actors.  *Butts v. County of Volusia*, 222 F.3d
891, 894-95 (11th Cir. 2000).  Section 1981 claims against state actors must be brought
pursuant to 42 U.S.C. § 1983 because "§ 1983 provides the exclusive remedy against
state actors for violations of the rights contained in § 1981."  *Id.* at 893 (citing *Jett v.*

*Dallas Independent School District*, 491 U.S. 701 (1989)).  In this case, however, Martin acknowledges that she has no viable claim under section 1983 because the "statute [of limitations] had run" by the time she filed her amended complaint.[7]  (Doc. 34 at 17 n.2). Thus, her section 1981 claim is properly asserted only against those Defendants who are not state actors.

Of the three potential Defendants—Peach County, Georgia, Sheriff Deese in his official capacity as Sheriff, and Sheriff Deese in his individual capacity—only Sheriff Deese in his individual capacity is not a state actor.[8]  *See Butts*, 222 F.3d 891 (affirming the district court's decision that the county was a state actor and therefore not a proper defendant under section 1981); *see also Redding v. Tuggle*, 2006 WL 2166726 at *10 (N.D. Ga. July 31, 2006) (dismissing section 1981 claims against the county and the Sheriff in his official capacity because plaintiffs "can only bring suit against [the county] and the individually named Defendants in their official capacities under § 1981 through § 1983").  Accordingly, Sheriff Deese in his individual capacity is the only proper Defendant to Martin's section 1981 claim.

Similarly, the Court must also determine who the proper Defendant is for Martin's Title VII claims.  Martin's Title VII claims may only be brought against her "employer." 42 U.S.C. § 2000e-2(a)(1).  Martin seeks to hold both Peach County and Sheriff Deese in his official capacity liable as her employer, in effect arguing that she was an

---

[7] Martin filed her initial Complaint pro se.  It was not until current counsel entered an appearance that she filed an amended complaint containing a section 1981 claim.

[8] The Plaintiff appears to have accepted this fact, noting in her Response that "nothing … prevents [her] from proceeding against Defendant Deese individually under the private right of action provided by § 1981."  (Doc. 34 at 18 n. 2).

Case 5:10-cv-00236-MTT   Document 38   Filed 10/12/11   Page 12 of 34

employee of both Peach County and the Sheriff.  However, for the reasons set forth

below, the Court concludes that Sheriff Deese in his official capacity, and no other

entity, is Martin's employer for Title VII purposes.

A person or entity's status as an employer is a matter of federal law, but state law

is relevant insofar as it informs the analysis of the employment relationship.  *Calderon v.

Martin County*, 639 F.2d 271, 273 (5th Cir. 1981).[9]  The determination of whether a

person or entity constitutes an employer for purposes of Title VII revolves around the

scope of their control and supervision of the employment relationship.  *Lyes v. City of

Riviera Beach*, 166 F.3d 1332, 1345 (11th Cir. 1999).  In support of her assertion that

Peach County, in addition to Sheriff Deese, was her employer, Martin cites the Eleventh

Circuit's decision in *Lyes v. City of Rivera Beach* and that court's use of the National

Labor Relations Board "four-part test."  *Id.* at 1341.

Martin's claim that *Lyes* "is dispositive of the issue" is misplaced.  *Lyes*

addressed the issue of whether multiple entities should be aggregated and considered a

"single employer" or "integrated enterprise" for purposes of reaching the fifteen-person

jurisdictional threshold required for Title VII claims.  That is not the issue here.

Although *Lyes* is not dispositive, it does provide some guidance.  In *Lyes*, the

Eleventh Circuit stated that in determining who the employer is for purposes of Title VII,

a court should focus on which entity "is in control of the fundamental aspects of the

employment relationship that gave rise to the claim."  *Id.* at 1345.  In this case, as

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

discussed below, the aspects of the employment relationship from which Martin's claims arise—employment and personnel decisions—do not involve sufficient county involvement for Peach County to be liable as her employer.

In Georgia, the office of Sheriff is an elected constitutional office, independent from the county and its governing body.  Ga. Const. art. IX, § 2, ¶ 1(c)(1).  Pursuant to Article IX of the Georgia Constitution and O.C.G.A. § 15-16-23, Sheriffs have the sole responsibility to hire and fire employees and to direct and control their duties and daily activities.  However, Georgia Sheriffs can elect to place their employees in a county's civil service system, and if they do, their personnel authority may be limited.[10]  *Wayne County v. Herrin*, 210 Ga. App. 747, 753, 437 S.E.2d 793 (1993).  Significantly, Sheriff Deese has not opted into the Peach County Civil Service System.  (Deese Aff. ¶ 17).  A county can take no action affecting a Sheriff's employees when the Sheriff has not placed his office under the county's civil service system.  *Grech v. Clayton County, Georgia*, 335 F.3d 1326, 1338 (11th Cir. 2003) (internal quotation marks and citation omitted).

Nevertheless, Martin points to several areas of her employment that illustrate, in some ways, the county's involvement.  For example, Peach County is required by state law to fund the salaries and expenses of the PCSO.  O.C.G.A. § 15-16-20.  Also, Sheriff Deese has adopted and implemented several county policies for use by PCSO, such as

---

[10] Even this, however, does not necessarily demonstrate that the county exercises sufficient control over the day-to-day activities of the Sheriff's employees to render the county liable under section 1983 or Title VII.  *See Redding*, 2006 WL 2166726 at *7-9.

the county's substance abuse policy and its personnel manual.[11]   In addition, County

HR Director Julie Daniel was present at Martin's termination meeting, and Martin's

Separation Notice was signed by Daniel on a form listing Martin's employer as "Peach

County Board of Commissioners."  (Doc. 36-1).  According to Sheriff Deese, he consults

with Daniel and County Administrator Marcia Johnson from time to time on personnel

matters because of their HR experience, and, in this case, he wanted to ensure "Martin

was afforded all her rights."  (Deese Aff. ¶¶ 3, 9).

      Despite the occasional interrelation between Peach County and the Sheriff, there

is little evidence in the record suggesting that Peach County had any involvement in the

decisions giving rise to Martin's claims.  It is clear to the Court, and on this point Martin

does not contend otherwise, that Peach County does not have the authority to hire,

transfer, promote, discipline, or discharge employees of the Sheriff.  Moreover, it is the

duty and obligation of the Sheriff to establish work schedules, to oversee assignments,

and to train his employees.  Accordingly, because Peach County is not Martin's

employer for purposes of Title VII, it is entitled to summary judgment on Martin's Title

VII claims.

---

[11] In her affidavit, County Administrator Marcia Johnson sheds some light on the relationship between
Peach County and the Sheriff's Office: "Employees of Sheriff Terry Deese are not employees of Peach
County.  Because the operations of the Sheriff's Department are funded by the County, including payroll
and compensation of the Sheriff's employees, Peach County does handle some administrative personnel
matters for the Sheriff.  This includes payroll, workers compensation coverage, fringe benefits such as
health insurance, and random drug testing.  As a result, there are some documents signed by employees
sued in connection with those activities that identify the employee as a Peach County employee, but that
is simply the result of the efficiency of the same form being used for the employees of Peach County and
the Sheriff….  Employee policies, discipline, hiring and firing of deputies, staff and detention officers
working for the Sheriff are the sole responsibility of the Sheriff."  (Johnson Aff. ¶ 4).

**B.  Title VII, 42 U.S.C. § 1981, and the *McDonnell Douglas* Framework**

Martin brings claims of gender and race discrimination and retaliation under Title VII and 42 U.S.C. § 1981.  Although section 1981 only prohibits discrimination based on race, Title VII and section 1981 "have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Thus, the Court will address Martin's Title VII claims with the understanding that the same analysis applies to her section 1981 claims.

Although Martin claims to have direct evidence of race and/or gender discrimination, she, in fact, does not.  Martin claims that Captain White's statement that the PCSO had "never had a pregnant Deputy before" and that they "[had] to find out what to do with [her]" amounts to direct evidence of gender discrimination.  Direct evidence consists of "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor."  *Schoenfeld v. Babbit*, 168 F.3d 1257, 1266 (11th Cir. 1999) (internal quotation marks and citation omitted).  "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004).  White's alleged statements do not meet this strict standard.

In the absence of direct evidence, Martin, like most victims of alleged job discrimination, relies on circumstantial evidence and the framework for analyzing circumstantial evidence first applied in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to make her case.  Under the *McDonnell Douglas* test, a plaintiff must first

-15-

establish a prima facie case of discrimination, the test for which differs slightly for each

of Martin's claims.  If a plaintiff establishes a prima facie case of discrimination, the

burden of production, but not the burden of persuasion, shifts to the employer to

articulate a legitimate, nondiscriminatory reason for the employment action.  *Texas*

*Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).

The burden then returns to the plaintiff to prove that the employer's reasons are

pretextual.  *Id.* at 253.  At the summary judgment stage, the employee can meet this

burden by producing evidence "sufficient to permit a reasonable factfinder to conclude

that the reasons given by the employer were not the real reasons for the adverse

employment decision."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.

1997).  If the proffered reason is one that might have motivated a reasonable employer,

the employee "must meet that reason head on and rebut it, and the employee cannot

succeed by simply quarreling with the wisdom of that reason."  *Chapman v. AI.*

*Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  If a defendant articulates more than

one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to

survive summary judgment.  *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308

(11th Cir. 2007) (citation omitted).

If the employee meets this final burden, then the finder of fact may find the

employer liable for discrimination.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530

U.S. 133, 147 (2000).

However, successful navigation of the *McDonnell Douglas* test does not

necessarily guarantee that a plaintiff can survive summary judgment.  In *Reeves*, the

Supreme Court held that there are "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."[12] 530 U.S. at 148.  In this event, judgment as matter of law for the defendant is appropriate.  *Chapman*, 229 F.3d at 1025 n.11.  At least in the Eleventh Circuit, this marked a significant change in the law.  Before *Reeves*, the Eleventh Circuit had held that an employer was never entitled to judgment as a matter of law once a plaintiff offered sufficient evidence of pretext.  *Combs*, 106 F.3d at 1538.

### i.    Disparate Treatment

Generally, Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] … sex."  42 U.S.C. § 2000e-2(a)(1).  In addition to race and regular gender discrimination claims, Martin also brings claims of gender discrimination under the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), which amended Title VII by providing that the prohibition against employment-related discrimination "on the

---

[12] Specifically, the Court noted that:

> an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148.  The Court determined the following factors are relevant in deciding whether judgment as a matter of law is appropriate: "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  *Id.* at 148-49.

basis of sex" includes discrimination based on pregnancy.  *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312-13 (11th Cir. 1994).[13]  To establish a prima facie case for disparate treatment under Title VII and the PDA, Martin must establish that "(1) she is a member of a group protected by Title VII, (2) she is entitled to, or qualified for her position, (3) she suffered an adverse employment action, and (4) she was treated less favorably than similarly situated employees who are not members of her protected class."  *Brockman v. Avaya, Inc.*, 545 F. Supp.2d 1248, 1252 (M.D. Fla. 2008) (applying *McDonnell Douglas* framework to PDA claim).  Here, it is not disputed that Martin is a member of a protected class (pregnant black female) or that she suffered an adverse employment action (two-day suspension and termination).  The Defendants do dispute the remaining elements of her prima facie case.

With regard to element (2), whether Martin was entitled to or qualified for her position, the Defendants cite the incident of alleged insubordination that led to her termination as the basis for concluding she was not qualified for her job as a Detention Officer.  (Doc. 31-2 at 17).  However, "[c]onsideration of the precipitating event arguably collapses the *McDonnell Douglas* test and obviates a plaintiff's ability to establish pretext."  *Robertson v. Home Depot (U.S.A.), Inc.*, 976 F. Supp. 1467, 1473 (S.D. Fla. 1997) (citing *Gill v. Reorganized Sch. Dist. R-6 Festus, Mo.*, 32 F.3d 376, 378 (8th Cir.

---

[13] It is unclear whether Martin intended to bring regular gender discrimination claims in addition to gender discrimination claims under the PDA, or just gender discrimination claims under the PDA.  Out of an abundance of caution, the Court will analyze Martin's claims as both regular gender and PDA gender discrimination claims.

1994)).[14]  The Defendants' argument is therefore misplaced at this stage of the

*McDonnell Douglas* analysis.[15]  Their argument that Martin's alleged insubordination

demonstrates her lack of qualifications is really their legitimate, nondiscriminatory

reason for her discharge.  Although Martin had received several reprimands during her

tenure at the jail, she had, by most accounts, fulfilled her responsibilities as a Detention

Officer for approximately three-and-a-half years.  Thus, the Court finds that Martin was

qualified for her position.

    The final element of Martin's prima facie case requires her to demonstrate that

she was treated less favorably than similarly situated employees who are not members

of her protected class.  To satisfy this prong, Martin must identify an employee outside

her protected class to whom she is "similarly situated in all relevant respects."  *Holifield*

*v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  "[T]he quantity and quality of the

comparator's misconduct [must] be nearly identical to prevent courts from second-

guessing employers' reasonable decisions and confusing apples with oranges."

*Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

    With regard to her termination, Martin has not identified a proper comparator.

She alleges that white male officer Daniel Morgan committed numerous infractions,

including telling Sergeant Willis to "kiss his backside," but that he was not terminated or

---

[14] In *Gill*, the Eighth Circuit held that the district court "prematurely focused on the alleged misconduct that triggered the adverse employment decision" when it considered the event that triggered the discharge at the prima facie stage.  32 F.3d at 378.

[15] A plaintiff's burden of establishing that she is qualified for her position is minimal.  For example, in cases where a plaintiff has held a position for a significant period of time, qualification for that position, insofar as the prima facie case is concerned, can be inferred.  *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n. 2 (11th Cir. 1987).

reprimanded.  (Martin Dep. at 65).  For several reasons, the Court concludes that Officer Morgan is not a similarly situated employee.  First, as the Court noted in an earlier footnote, Martin's basis of knowledge for many of the statements she has offered as proof of discrimination, including Officer Morgan's alleged statement and the resulting punishment, is unsubstantiated.  When asked during her deposition what information she had about what goes on when another employee is fired or resigns, Martin responded, "Because people, you know, talk."  (Martin Dep. at 92).  According to Sheriff Deese, her claims of how the Sheriff's Office makes employment decisions "are outside the scope of her knowledge.  She would have no access to information on personnel matters relating to other employees."  (2nd Deese Aff. ¶ 2).  In short, Martin's claims about Morgan are hearsay, and unless the specific circumstances warrant an exception, a court cannot consider inadmissible hearsay on a motion for summary judgment.  *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999).  The circumstances in this case do not fall within any exception to that general rule.

Second, Officer Morgan's alleged misconduct is not sufficiently similar to render him a suitable comparator.  Officer Morgan was allegedly insubordinate to his supervisor, Sergeant Willis, by telling her to "kiss his backside."  Martin, on the other hand, was allegedly insubordinate to Sheriff Deese, the constitutionally elected officer for whom each and every PCSO employee works.  The difference in these alleged transgressions is apparent, and it comes as no surprise that insubordination to the Sheriff warrants a sanction more severe than insubordination to a superior.  Martin even admitted in her deposition that she does not know of anyone else who has been insubordinate to the Sheriff and kept his or her job.  (Martin Dep. at 68-69).

Accordingly, Martin has failed to identify a comparator or to direct the Court to any other circumstantial evidence suggesting that race or gender-based discrimination played a role in her termination, and her Title VII disparate treatment claim based on her termination must fail. *Holifield*, 115 F.3d at 1562 (holding that summary judgment is appropriate if the plaintiff fails to identify a similarly situated employee and no other evidence of discrimination is present).

Regarding her suspension, Martin identifies white male Officer Borders, one of two other officers involved in the incident that led to Martin's suspension, as the similarly situated employee who received more favorable treatment. As discussed previously, Martin and Sergeant Davis, a non-pregnant black female, both received two-day suspensions for their misconduct while Officer Borders received only a verbal reprimand.

The Defendants argue that Officer Borders is not a suitable comparator (a) because the misconduct for which he received a reprimand was not sufficiently similar to Martin's misconduct and (b) because Martin had a more extensive disciplinary history, including a reprimand for a similar offense. At this point, the analysis under the *McDonnell Douglas* framework becomes muddled. The Defendants' argument consists almost entirely of its claim that Martin has not identified a proper comparator and has therefore failed to establish a prima facie case. In essence, the reasons they claim Officer Borders is not a suitable comparator—dissimilar misconduct and disciplinary histories—are also their proffered legitimate, nondiscriminatory reasons for the differing treatment. Because the initial burden of establishing a prima facie case of discrimination is not onerous, and because the Court feels the Defendants' argument

goes more to Captain White's subjective reasoning for imposing different punishments (i.e., the legitimate, nondiscriminatory reasons for her actions) rather than whether their misconduct was objectively similar for purposes of establishing a similarly situated employee, the Court will assume Martin has established a prima facie case and will proceed to the next step of the *McDonnell Douglas* analysis.[16]  *See Robertson*, 976 F. Supp. 1467.

Because Martin has at least arguably proved a prima facie case, a presumption of discriminatory intent applies unless the Defendants meet their burden of production by advancing a legitimate, nondiscriminatory reason for their disparate treatment.  Here, the Defendants claim that Martin was treated less favorably than Borders, not because Martin was pregnant or African-American, but because Captain White perceived the severity of Martin's transgression as more serious than that of Officer Borders and because of Martin's prior disciplinary history.  White reviewed a video of the incident and then, based on her knowledge of and experience in the jail's booking procedures, made her decision.  (White Aff. ¶ 8).  According to White, "the two offenses were very different in magnitude.  Officer Borders should have searched the inmate, but he reasonably assumed that the inmate had been searched by the day shift.  Officer Martin, by contrast, negligently allowed the inmate access to his cell phone, and did not search him before leaving for the day.  She had a prior similar reprimand, which,

---

[16] When the relevant prong of the *McDonnell Douglas* test is qualifications, which, as noted, is typically not difficult to establish, it is easy to grasp why a court should defer consideration of a defendant's argument that the precipitating conduct for the adverse action demonstrates a lack of qualifications. When the relevant prong is a suitable comparator, which is not as easy to establish, it can be argued that there is less reason to defer consideration of an argument that a comparator is not suitable.  Still, not deferring would deprive a plaintiff of an opportunity to prove pretext.

although it was several years earlier, showed a neglect of duty." (White Aff. ¶ 8).

Accordingly, the presumption of discrimination is rebutted, and Martin must show that

the Defendants' legitimate, nondiscriminatory reasons are pretext.

As noted above, Martin may carry her burden of establishing that the Defendants'

proffered reasons for her treatment were pretextual by producing evidence "sufficient to

permit a reasonable factfinder to conclude that the reasons given by the employer were

not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528.[17]

If the proffered reason is one that might have motivated a reasonable employer, then

---

[17] There is some confusion regarding a plaintiff's burden to prove pretext. Citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993), some cases suggest that a plaintiff responding to an employer's motion for summary judgment must prove that the employer's legitimate, nondiscriminatory reason is false *and* that discrimination was the real reason for the employer's action. *See Upshaw v. Ford Motor Co.,* 576 F.3d 576, 587 (6th Cir. 2009); *Maxfield v. Cintas Corp. No. 2,* 427 F.3d 544, 550-51 (8th Cir. 2005). However, the Supreme Court in *St. Mary's* did not address a plaintiff's burden at the summary judgment stage. Rather, the Court addressed whether an employee is entitled to judgment as a matter of law when the factfinder has concluded that the employer's nondiscriminatory reason is false, but nevertheless found that the employer did not intentionally discriminate against the plaintiff. Moreover, as noted by Judge Wilson in his concurring opinion in *Convoy v. Abraham Chevrolet-Tampa, Inc.,* 375 F.3d 1228, 1236 (11th Cir. 2004), the Supreme Court in *St. Mary's* "flatly rejected the so-called 'pretext-plus' approach to discrimination analysis, which had required the plaintiff not only to demonstrate that the employer's asserted reasons were pretextual, but also to introduce additional evidence of discrimination." In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), the Supreme Court disposed of any lingering viability of pretext-plus analysis. While it is true the plaintiff must ultimately prove intentional discrimination, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147 (emphasis in original). In a concurring opinion, Justice Ginsburg, in a summary of the majority's holding, wrote that a plaintiff "*may* survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a 'prima facie case,' …; and second, evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false." *Id.* at 154 (emphasis in original); *see also Dulin v. Bd. of Com'rs of Greenwood Leflore Hosp.*, __ F.3d __, 2011 WL 4090850 (5th Cir. Sept. 15, 2011). Clearly, at the summary judgment stage, the plaintiff, in rebutting the employer's proffered legitimate, nondiscriminatory reason, does not shoulder the burden of producing evidence both of falsity and that the real reason was discrimination. Indeed, the *McDonnell Douglas* test is all about proving intentional discrimination by circumstantial evidence; if the employee had direct evidence that the real reason for the adverse employment action was discrimination, the employee would have no need to resort to the *McDonnell Douglas* test.

Martin "must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.

When an employee attempts to prove pretext by showing that other employees who also engaged in misconduct were treated differently, "the quantity and quality of the comparator's misconduct must be nearly identical to the plaintiff's." *Bush v. Houston County Comm'n*, 414 Fed. Appx. 264, 267 (11th Cir. 2011) (internal quotation marks and citation omitted). "Employees who have committed multiple policy violations are not similarly situated to employees who committed only one such violation." *Id.* Here, Martin cannot prove pretext. First, she has produced no evidence of Borders' disciplinary and employment histories to show that they were "similarly situated" in that regard. Because Martin's past offenses were considered by White when she handed down punishment, whether Borders, like Martin, had similar prior offenses is significant to the issue of whether they were similarly situated. *Id.* at 268.

Second, when faced with Captain White's explanation for her treatment of Martin as compared to Borders, Martin does nothing to call into question the veracity of White's proffered reasons, other than conclusively alleging that the written reprimands in her personnel file are "lies." It is not enough to simply question the wisdom of the employer's decision. "Different types and degrees of misconduct may warrant different types and degrees of discipline," and the federal courts do not sit as a kind of "super-personnel department." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1325 (11th Cir. 2006); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). The appropriate inquiry for this Court is not whether the severity of Martin's and Borders' transgressions was actually dissimilar enough to warrant differing degrees of

discipline, but whether the employer gave an honest explanation for its behavior and whether that reason is one that might motivate a reasonable employer.  *Chapman*, 229 F.3d at 1030-31.  The Defendants have done just that, and Martin has not shown that the Defendants' stated reason was actually a pretext for discrimination.[18]  Accordingly, because Martin has failed to establish that the Defendants' legitimate, nondiscriminatory reason was pretext, the Defendant is entitled to summary judgment on Martin's Title VII disparate treatment claims.

Because Title VII and section 1981 claims have the same requirements of proof, judgment as a matter of law is also appropriate for the Defendant on Martin's race discrimination claims under section 1981.  *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (concluding that the court need not discuss Title VII disparate treatment claims and section 1981 claims separately because the legal elements are identical).

### ii.   Retaliation

Under Title VII, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Martin brings claims for retaliation under both Title VII and 42 U.S.C. § 1981.  The elements of proof for both are identical, so, as above, the Court will address Martin's Title VII retaliation claim with the understanding that the same analysis

---

[18] Also working against Martin is the fact that Captain White, the decision-maker with regard to her suspension, is a member of Martin's protected class, at least insofar as Martin's claims of race and gender discrimination are concerned, thus increasing the difficulty of Martin's burden of proving pretext. *Elrod*, 939 F.2d at 1471.

applies to her section 1981 retaliation claim.  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

To establish a prima facie case of retaliation under Title VII or section 1981, Martin must show that (1) she engaged in statutorily-protected expression; (2) she suffered an adverse employment action; and (3) there was some causal connection between the two events.  *Pennington v. City of Huntsville*, 262 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation marks and citation omitted).  As with her disparate treatment claims, if Martin makes out a prima facie case of retaliation, the burden shifts to the employer to articulate legitimate reasons for the adverse employment action, and, if the employer does so, Martin has the ultimate burden of showing by a preponderance of the evidence that the employer's reasons were pretextual.  *Holifield*, 115 F.3d at 1564-66.

The Defendants do not contest that Martin's termination constitutes an adverse employment action, but they do dispute that she has satisfied the remaining elements of her prima facie case.  "Statutorily protected expression includes internal complaints of discrimination to superiors, as well as complaints lodged with the EEOC and discrimination-based lawsuits."  *Gerard v. Board of Regents of State of Ga.*, 324 Fed. Appx. 818, 825 (11th Cir. 2009) (citation omitted).  Martin claims that she complained to the Appeal Board at her appeal hearing about her discriminatory treatment as compared to Officer Borders.  (Martin Aff. ¶ 19).  The Appeal Board's recommendation somewhat contradicts Martin's claim that she complained about discrimination.  The Appeal Board recommendation states, "[Martin] felt that she should bear no more responsibility that [sic] the other detention officers that failed to properly follow procedure in this situation,

and were given a reprimand for their violations.  We agree with this claim and feel that the supervisor on the shift, who was present at the incident should be held responsible…."  (Doc. 31-3 at 32).

First, nothing in the Appeal Board's letter shows that Martin complained to the Appeal Board about *discrimination*.  Rather, it merely informs Sheriff Deese that Martin thought Sergeant Davis and Officer Borders should have borne equal responsibility for their violations.  Second, although not dispositive of the issue, the Appeal Board concluded that "the supervisor on the shift, who was present at the incident should be held responsible."  The "supervisor on the shift" was Sergeant Elizabeth Davis, who is a black female.  Notably, the Board did not recommend any action or additional punishment be taken or levied against white male Officer Borders other than that already taken.[19]  It is, at a minimum, puzzling that the Board's response to Martin's claims that she was discriminated against for being a pregnant black female would be to recommend harsher treatment for the other black female involved in the incident, as opposed to a recommendation that the white male receive additional punishment.  Nonetheless, because the Court must resolve all reasonable doubts about the facts in Martin's favor, and because she alleges that she raised claims of discrimination at the appeal hearing, the Court concludes that she engaged in the requisite statutorily-protected expression.

---

[19] Because neither party offers the testimony of any person, other than Martin, who was present at the April 4 appeal hearing, the Court is forced to parse the language of the Appeal Board's letter to determine, as best it can, what exactly transpired at the hearing.

The final element of Martin's prima facie case requires her to prove a causal link between the protected activity and the adverse employment action.  A causal link can be established by showing that "the protected activity and the adverse action were not wholly unrelated."  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999).  Generally, to show that the two are not wholly unrelated, a plaintiff must show "that the decision maker was aware of the protected conduct at the time of the adverse employment action" and a close temporal proximity between the protected activity and the adverse action.  *Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 971, 799 (11th Cir. 2000).  Although a close temporal proximity can be sufficient to create an issue of fact regarding the causal connection prong of the prima facie case, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."  *Id.* (citation omitted).

Here, Sheriff Deese, the decision-maker with regard to Martin's termination, asserts he was not aware of Martin's alleged claims of unlawful discrimination when he made the decision to terminate her employment with the Sheriff's Office.  According to Sheriff Deese, "[he] was never told by anyone that [Martin] felt that she had been discriminated against" or that she raised those concerns at the appeal hearing.  (Deese Aff. ¶ 13).  The letter from the Appeal Board "is the only information [Deese] had with respect to that hearing," and, as the Court discussed in its protected expression analysis above, that letter does not mention that Martin told the Board that she felt she had been discriminated against because of her race, gender, or pregnancy.  (Deese Aff. ¶ 13).  Further, Sheriff Deese claims that "Officer Martin never mentioned that she felt

that she had been discriminated against for her race or sex when [they] met on April 11 or 16," and that he "did not learn of those contentions until she filed her EEOC claim after she was terminated."  (Deese Aff. ¶ 13).

Martin claims that the Appeal Board was "part of the group decision [and] had knowledge and was in communication with the Sheriff" and that, as a result, the Sheriff had actual or constructive knowledge of Martin's complaints of discrimination.  (Doc. 34 at 21).

The Court agrees with the Defendants that Martin has failed to show that Sheriff Deese was actually aware of her alleged complaints of discrimination to the Appeal Board at the appeal hearing.  "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent."  *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) (citation omitted).  The decision to fire Martin was the Sheriff's decision—a decision in which the Appeal Board played no role.  Thus, assuming Martin relayed her concerns of discrimination to the Appeal Board, their knowledge of her complaints cannot be imputed to Deese, the decision-maker.  Accordingly, the Defendants are entitled to summary judgment on Martin's retaliation claims based on her alleged complaints of discrimination at the appeal hearing.

That does not end the Court's inquiry, however.  Martin claims Sheriff Deese had further knowledge of her discrimination complaints because she brought them to his attention directly at the April 11 meeting when she asked Deese, "Why was I the only one?  Why did Officer Borders only receive a verbal reprimand, was it because he is a white male or because I am a pregnant black female?"  (Martin Aff. ¶ 29).  At this point,

Martin claims Deese became upset and accused Martin of "taking things personally." (Martin Aff. ¶ 29).[20]  Notwithstanding the inconsistency between her deposition testimony and her sworn affidavit, viewing the facts in Martin's favor, she has shown that Sheriff Deese was arguably aware of her complaints of discrimination and has therefore established a prima facie case.

Because Martin has proved her prima facie case of retaliation, the burden of production shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for Martin's termination.  Here, the Defendants have produced significant evidence that Martin was fired, not because of her race, gender, or pregnancy, but because of her prior disciplinary history and, primarily, her insubordination at the April 11, 2008, hearing.  (Doc. 37 at 5).  In particular, Sheriff Deese directs the Court to the PCSO personal conduct policy, which states that "[a]n officer may be disciplined or discharged for [her] speech or conduct before a superior officer if it is bitter, discourteous, abusive, disloyal, profane or threatening."  (Doc. 31-3 at 14).  According to Sheriff Deese, whose sentiments are echoed by White, Martin's conduct at the April 11 meeting was "at least bitter and discourteous.  She showed no respect for [him] and Captain White.  She was contentious, and willfully refused to engage in a discussion of the matter that [he] felt

---

[20] During her deposition, Martin discussed the April 11 meeting with Sheriff Deese in detail but she never mentioned that she raised her concerns of discrimination.  For example, when asked whether Deese was mad at Martin at the meeting because of the absenteeism and other things in her file, Martin responded, "That's the way he perceived, but, *to me*, it was as if there was more going on.... *I was thinking*, something else is going on here."  (Martin Dep. at 56-57) (emphasis added).

important: her job performance and absenteeism." (Deese Aff. ¶ 8).[21]  Deese even told Martin at the meeting that her behavior was insubordinate.  (White Aff. ¶ 9).

Martin attempts to create an issue of material fact regarding whether or not she was actually insubordinate.  Throughout her response to the Defendants' motion for summary judgment, during her deposition, and in her affidavit, she claims that she did not refuse to discuss her disciplinary history and absenteeism out of insubordination, but rather because she was a pregnant female in a heightened emotional state because she was being bullied and berated.  (Martin Aff. ¶ 30).  She claims the Sheriff's conduct was nothing more than a "fishing expedition" to get her fired.  (Martin Aff. ¶ 28).

However, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision-maker's head."  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (citation omitted).  "The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as it is not for a discriminatory reason."  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1188 (11th Cir. 1984).  Although Martin may disagree with Sheriff Deese's interpretation of her behavior at the April 11 hearing, she has not put forth sufficient evidence to show that Deese's explanation for his decision is unworthy of credence.  Accordingly, Martin has failed to establish that the Defendants' legitimate, nondiscriminatory reason was pretext, and the Defendants are entitled to summary judgment on Martin's Title VII and section 1981 retaliation claims.

---

[21] Sheriff Deese's comment that the "Sheriff's Department is a quasi-military organization, and respect for superior officers is crucial" also is not lost on the Court.

## C. Intentional Infliction of Emotional Distress

Martin also seeks compensatory and punitive damages against Sheriff Deese under Georgia state law for intentional infliction of emotional distress.  In his motion for summary judgment, the Defendant contends that Martin's state law claim is barred by the statute of limitations.  The statute of limitations in Georgia for an intentional infliction of emotional distress claim is two years.  O.C.G.A. § 9-3-33; *Mears v. Gulfstream Aerospace Corp.*, 225 Ga. App. 636, 639, 484 S.E.2d 659 (1997).  Martin filed her original complaint on June 15, 2010, but that complaint does not contain a claim for intentional infliction of emotional distress.  Her state law claim appears for the first time in her amended complaint, which was filed December 1, 2010.  The Court will assume that Martin's intentional infliction of emotional distress claim arises "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading," and thus her amended complaint relates back to the date of filing of the original complaint.  Fed. R. Civ. P. 15(c)(1)(B).  Accordingly, the relevant date for analyzing whether Martin's state law claim is barred by the statute of limitations is June 15, 2010, and any claim concerning conduct occurring before June 15, 2008, is barred by the two-year statute of limitations.  Given that Martin was fired on April 16, 2008, her claims are barred, absent some exception or tolling of the limitations period.

Martin alleges that the two-year statute of limitations has not run (a) because Deese's conduct constitutes a "continuing tort," with the statutory clock beginning to run only upon completion of the last tortious act, and (b) because some of the damage she sustained, including a loss of benefits, loss of POST certification, and loss of her home

and car, occurred within the statutory time frame and that the statute should start to run when that damage was incurred.

The continuing tort doctrine "applies where any negligent or tortious act is of a continuing nature and produces injury in varying degrees over a period of time." *Mears*, 225 Ga. App. at 640, 484 S.E.2d 659 (internal quotation marks and citation omitted).  In such a case, "the statute of limitations does not begin to run until such time as the continued tortious act producing injury is eliminated."  *Id*.  However, the seemingly expansive scope of the continuing tort doctrine is limited by the discovery rule, which provides that "a continuing tort cause of action accrues when a plaintiff discovers, or with reasonable diligence should have discovered, both the injury and the cause thereof."  *Waters v. Rosenbloom*, 268 Ga. 482, 483, 490 S.E.2d 73 (1997).  For example, in *Fox v. Ravinia Club, Inc.*, 202 Ga. App. 260, 414 S.E.2d 243 (1991), cited by Martin, the plaintiff filed her complaint in August 1989, suing her employer for a series of actions which culminated in her termination in August 1987.  The Georgia Court of Appeals upheld summary judgment in favor of her employer, concluding that her cause of action accrued in April 1987 when she first began seeing a psychologist rather than in August 1987 when she was terminated.  *Id*. at 261, 414 S.E.2d 243.

In short, the continuing tort doctrine does not save Martin's claim.  First, there is no evidence that any of Sheriff Deese's allegedly tortious conduct continued after June 15, 2008.  The continuing tort doctrine applies in cases where there exists persistent wrongful conduct, not mere persistent injury resulting from an earlier wrong.  *See Bryant v. Crider*, 209 Ga. App. 623, 627, 434 S.E.2d 161, 165 (1993); *see also Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980).

Second, Martin discovered, or should have discovered, her injury and the cause thereof when she was allegedly reduced to tears and forced to leave the meeting with Sheriff Deese on April 11, 2008.  At the latest, her emotional injury was discoverable when she was terminated on April 16, 2008.  Therefore, to the extent Martin's claim is based on this conduct, the claim is barred by the statute of limitations.  Accordingly, the Defendant is entitled to summary judgment on Martin's state law claim for intentional infliction of emotional distress.

## CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment is **GRANTED**.

**SO ORDERED,** this 12th day of October, 2011.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT